The following constitutes the
Memorandum Decision of the Court.
Signed July 09, 2008

_____

Roger L. Efremsky
U.S. Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

San Jose Division

In re CORRINA CURIEL LONA,          Case No. 03-53915 RLE

                                     Chapter 7

                Debtor.

_____/


              MEMORANDUM DECISION AFTER TRIAL


     Before the Court for decision is the objection of the debtor
Corrina Curiel Lona ("Lona") to the unsecured claim of Jose
Abreu, dba Intertel Communications ("Abreu").  Abreu's claim is
based on his contention that Lona was an actual or ostensible
partner with Timothy Turi ("Turi") in a business called Time Zone
Distributing ("Time Zone").  The objection is based on Lona's

Memo. Decision After Trial.

contention that she was merely an employee of Time Zone and is not responsible for its debts.

The matter has been tried and submitted for decision. Abreu is represented by Stevan C. Adelman of Miller, Morton, Caillat & Nevis, LLP. Lona is represented by David V. Duperrault of the Silicon Valley Law Group. At trial on June 4, 5, 8 and 11, 2007, Abreu offered the testimony of the chapter 7 trustee John Richardson, Eugene Katz and himself. Lona offered the testimony of Timothy Turi, Alvaro Amador, Swan Nguyen, Romulus Bobesku, Mauricio Diaz and Marysol Solorio. Lona declined to testify in her case-in-chief, but testified on rebuttal.

The following constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I. **PROCEDURAL BACKGROUND**

### A. **Lona Is Not Entitled to a Discharge**

Lona filed this chapter 7 case on June 16, 2003. The United States Trustee sued Lona under Bankruptcy Code §§ 727(a)(2)(A), (a)(2)(B), and (a)(4)(A) and the Court has entered an order denying Lona's discharge.

### B. **Lona Has Standing to Object to Abreu's Claim**

On the first day of trial, Abreu's counsel raised a question as to whether Lona had standing to object to Abreu's claim. Under the circumstances of this case, Lona has standing.

Bankruptcy Code § 502 provides that a "claim or interest, proof of which is filed under section 501 of this title, is

Memo. Decision After Trial.          2

deemed allowed, unless a party in interest . . . objects." The term "party in interest" is not defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure, but courts have held that standing in a bankruptcy context requires an "aggrieved person" who is directly and adversely affected pecuniarily by an order of the bankruptcy court. Fondiller v. Robertson (In re Fondiller), 707 F.2d 441, 442-43 (9th Cir. 1983) (citations omitted); Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 388 (2nd Cir. 1997).

Generally, a chapter 7 debtor does not have standing to object to claims because the debtor has no interest in the distribution of assets of the estate and therefore, is not an "aggrieved person." There are two recognized exceptions to this general rule: a chapter 7 debtor will have standing where (1) disallowance of a claim will produce a surplus for the debtor; or (2) where a claim will not be discharged. In re Willard, 240 B.R. 664, 668 (Bankr. D. Conn. 1999) (citing In re Toms, 229 B.R. 646, 650-51 (Bankr. E.D. Pa. 1999)); see also, Menick v. Hoffman, 205 F.2d 365 (9th Cir. 1953) (debtor was a "person aggrieved" with standing to challenge disallowance of tax claim where, if tax claim was not paid in bankruptcy, debtor would remain liable for such claim post-discharge).

The chapter 7 trustee testified that as of the trial date, the estate held $133,118 for payment of administrative expenses and unsecured claims, that unsecured claims exceeded $177,000 and that he had not objected to any of the pending claims. Tr. 146:6-147:18; 148:18-149:2. Given that Lona is not entitled to a

Memo. Decision After Trial.          3

discharge, if Abreu's claim is allowed, the pro rata share of the funds available to pay unsecured claims will be reduced and Lona will remain personally liable post-bankruptcy for any unpaid balance. As a result, Lona is an "aggrieved person" who is directly and adversely affected by an order of the bankruptcy court and has standing to object to Abreu's claim.

### C. Late-filed Trial Briefs

Following the first day of trial, Kathryn Diemer, counsel for Lona's husband, Jonas Lona, offered three briefs to address certain issues regarding standing and the admissibility of evidence.[1] Tr. 225:7-19. The Court declined to accept the briefs for several reasons. Tr. 225:20-23. Nevertheless, the Court resolved each of the issues Ms. Diemer raised and allowed her to act as special counsel to Lona in order to assist Mr. Duperrault throughout trial.[2]

### D. The Parties' Stipulations

For purposes of trial, the parties have stipulated: (1) Abreu is the moving party and has the burden of proof as to whether Lona was an actual or ostensible partner of Turi in Time Zone; and (2) the amount of Abreu's claim is $439,000.

/ / / /

---

[1] It is unclear why Ms. Diemer did this. The Court assumes it is because Ms. Diemer was acting as Jonas Lona's counsel and Corrina Lona's special counsel, vacillating between the two as she deemed appropriate. See, e.g., Tr. 4:12-13; 13:18-20; 14:25-15:1; 15:16-19; 595:10-15; Docket #242.

[2] See, Tr. 36:10-38:1; 41:8-44:13; 113:4-6; 113:12-116:17; 116:25-120:19; 215:8-216:9; 217:13-218:11; 219:5-225:6; 229:17-240:10; 164:12-165:12; 289:10-292:7; 293:4-294:10; 689:16-690:20.

Memo. Decision After Trial.        4

## II.  FACTUAL BACKGROUND

### A.  1994 - 1997: Turi and Lona Meet, Travel and Form Time Zone as a General Partnership

In 1994, Turi was working as a manager for a company that sold watches at trade shows. Tr. 470:25-471:19. That same year, Lona began to work for the company. Tr. 472:11-25. Turi and Lona worked together at this company until late 1996 or early 1997. Tr. 473:16-474:1. Subsequently, Turi and Lona traveled together to trade shows in Hong Kong, Argentina and the Philippines to explore starting a watch business together. Tr. 474:4-18; 608:20-609:16.

On March 21, 1997, in furtherance of the plan to start a watch business with Lona, Turi filed a Fictitious Business Name Statement ("FBS") to secure the name "Time Zone." Tr. 470:10-11; 474:6-20; 475:15-476:5. The FBS was signed only by Turi and identified the business as a general partnership with Turi and Lona as the general partners. Ex. 1; Tr. 607:13-608:2. Turi testified that Lona did not know he had put her name on the FBS, and had not authorized the use of her name. Tr. 475:8-17.

While it is unclear when the relationship started, how long it lasted, or whether it continued at the time of trial, during the time period relevant to this matter, Lona and Turi had a romantic relationship. Tr. 480:12-481:17.

### B.  Time Zone's Pre-Paid Phone Card Business

Time Zone began selling pre-paid phone cards in 1998. Tr. 456:16-23. Time Zone purchased phone cards from distributors such as Abreu and sold them to convenience stores which then resold them. Time Zone's profit was a percentage of the face-

Memo. Decision After Trial.            5

amount of each card.  For example, Time Zone would buy a $10
phone card for 65% of its face value, or for $6.50.  The
convenience store that sold the phone card would keep 25% of the
$10 purchase price.  Time Zone's profit was the remaining 10% of
the $10 purchase price.  Tr. 458:14-459:19.

### C.    1998 - 2001: Lona's Role at Time Zone

Turi testified that he hired Lona in late 1998 to assist him
with opening accounts at the convenience stores.  Tr. 461:23-
462:7.  In 1999, Time Zone also began selling phone cards to
other phone card distributors.  Tr. 483:23-484:2.  Lona had
authority to begin relationships with these distributors.   Tr.
485:6-25.  In 2001, Lona worked full time running the Time Zone
office while Turi and various drivers distributed phone cards to
the convenience stores.  Tr. 480:1-11; 481:24-483:7; 484:10-22;
485:6-16; 713:3-5.

Turi testified that he viewed Lona as an independent
contractor and he paid her $150 per day plus a commission of
approximately half percent of whatever she sold to distributors
who came to the office to pick up phone cards.  Tr. 462:11-464:8;
488:1-7; 617:4-14; 618:6-25.  Turi further testified that in
2001, he was paid approximately $36,000 from Time Zone while Lona
was paid $78,000.  Tr. 650:15-23; 652:24-653:9.  Turi testified
that the $78,000 that Lona received was salary plus commissions
and was not from the profits of the business itself.  Tr. 487:17-
488:7; 617:10-11; 653:9-16.  He also testified that he never gave
her a W-2, a W-4, or a 1099 form and never filed payroll tax
returns or withheld social security taxes.  Tr. 617:14-619:6.

Memo. Decision After Trial.        6

Lona testified that during the period relevant to this matter she ran the Time Zone office on a full-time basis and also did interior decorating and landscaping on a part-time basis. Tr. 709:18-21; 713:3-5; 729:12-17. Lona testified that her amended federal tax return for 2001 showed $400,000 in income for herself and her husband, that her husband's salary was approximately $45,000, and that Lona received $78,000 from Time Zone. Tr. 709:15-710:2. Lona testified that while she worked full-time at Time Zone, and her husband's "main" job was as a mechanic for Monterey Mushroom, they earned more than $277,000 from their side-jobs. Tr. 709:18-710:5; 711:9-19; 712;23-713:7; 729:12-21.

Lona's testimony regarding her income was confusing, contradictory and inconsistent. Tr. 709:15-740:25. No tax returns, W-2s, 1099s or similar documents were offered in evidence. In addition, Lona was convicted of felony tax evasion - apparently for years relevant to this matter. Tr. 708:20-709:1.

**D.  Abreu's Business with Time Zone**

Between January and December 2001, Abreu sold approximately $5 million worth of phone cards to Time Zone (with an approximate retail value of $7 million). Tr. 24:12-14; Ex. S-1. Initially, Abreu accepted Time Zone checks for payment and normal payment terms were 2 weeks. Tr. 31:8-14; 33:18. In late January 2001, a Time Zone check for $57,000 was returned for insufficient funds and Abreu thereafter required Time Zone to pay with cash or third-party checks written to Time Zone by its convenience store

Memo. Decision After Trial.          7

customers. Tr. 31:14-32:3. Despite this change in terms, Time Zone continued to fall behind in its payments. Ex. S-1.

Abreu testified that he first met Lona in March 2001. Tr. 26:9-10; 253:23-255:16. Lona testified that this first meeting was in May 2001. Tr. 705:9-17. According to Abreu, at their very first meeting Lona told Abreu that she and Turi had previously distributed watches, but that business had dried up, so they had gone to Latin America to explore starting a watch distribution business. After trying various ventures, Turi and Lona had begun to sell phone cards. Tr. 28:3-15. Abreu testified that at this first meeting, Lona also told him that she had invested $100,000 in Time Zone and was working very hard to make the business successful. Tr. 29:19-30:4.

Abreu also testified that when he first began supplying Time Zone with phone cards, he believed that Turi was the sole owner of Time Zone. Tr. 128:8-12. By mid-2001, however, after meeting Lona and regularly visiting the Time Zone office for this approximate 6 month period, Abreu began to believe that Turi and Lona were partners in Time Zone. Tr. 129:3-16.[3]

**E. Summer 2001: Lona's Plans to Reduce Time Zone Debt**

By the summer of 2001, Time Zone owed Abreu approximately $250,000. Ex. S-1. Abreu testified that in late June or early July, Lona told him of her plan to pay off or reduce the Time

---

[3] This testimony came from Abreu's deposition taken in 2002. Tr. 121:16-132:19. It is unclear whether counsel for Lona used this testimony to impeach Abreu or to refresh his recollection. Whatever the intended purpose, the deposition testimony was consistent with Abreu's other testimony in this proceeding.

Memo. Decision After Trial.          8

Zone debt.  According to Abreu, Lona planned to get a line of
credit secured by her house which she intended to use to purchase
shares of stock in a company called Soluminaire[4], then sell this
Soluminaire stock and use the proceeds to pay off the line of
credit, and then use the line of credit to repay Abreu.  Tr.
34:2-7; 34:15-22; 102:2-20; 103:17-22.  Abreu testified
that Lona made this promise to use the line of credit on more
than one occasion.  Tr. 35:15-21; 40:9-16.

Turi and Lona both testified that in July 2001, Abreu and
Turi met at Turi's house to discuss repayment of the Time Zone
debt.  Tr. 636:5-8; 700:2-701:6.  Lona testified that she was
present but claimed she did not participate in this meeting.  Tr.
663:9-16; 700:23-701:3.  Turi testified that during the meeting,
without prompting, Lona volunteered that Time Zone was not her
business.  Tr. 636:5-637:2; 638:16-24.  Lona, on the other hand,
testified that she responded that Time Zone was not her business
after Abreu specifically asked Lona to help Turi out.  Tr.
704:10-20.

On August 27, 2001, Abreu obtained a cashier's check in the
amount of $40,000, made payable to Lona.  Ex. 7.  Abreu testified
that the purpose of the check was to buy 40,000 shares of the
Soluminaire stock Lona had purchased with the proceeds of her
credit line.  Tr. 51:19-25; 52:6-7; 102:22-103:16.  Abreu stated
that Lona was not at the Time Zone office when he delivered the
check, so he left it with Turi.  Tr. 52:4-5.  Lona and Turi

---

[4]  The record is unclear as to the exact name of this company and
its spelling here is phonetic only.

Memo. Decision After Trial.          9

endorsed the check and deposited it in Time Zone's bank account. Tr. 578:16-21.[5]

### F. Fall 2001: Abreu's Belief that Turi and Lona Were Partners

Abreu testified that by late-August 2001, he had grown increasingly concerned about the growing delinquency in Time Zone's payments, and he began inquiring about Lona's promised use of a line of credit to repay him. Tr. 33:20-22. At this point, Lona and Turi began telling Abreu that Lona was simply an employee of Time Zone. Tr. 33:10-23; 52:17-53:7; 89:20-90:5; 131:10-132:13. In response, Abreu asserted that he knew that Turi and Lona were partners and he wanted to assist them in coming up with a plan to repay the debt. Tr. 268:3-10. Abreu testified that Lona's response was "We're sorry. We want to pay you back. We're trying the best we can." Tr. 268:11-15. Abreu testified that if Lona had told him in August 2001 that she was

_____

[5] Turi claims that *he* sold the stock to Abreu as an "investment." Tr. 575:3-6; 577:13-15. While this might explain the deposit of the $40,000 check into Time Zone's account if Time Zone were a sole proprietorship, Turi's explanation simply does not make sense and, in fact, none of the testimony regarding this stock transaction makes sense. When Abreu purchased the stock, Time Zone owed Abreu approximately $500,000. Abreu was apparently already holding 112,000 shares of Turi's shares of Soluminaire stock as collateral for the Time Zone debt. Ex. S-1; Tr. 665:14-18. If, in fact, Time Zone was Turi's sole proprietorship and he owed Abreu $500,000, why didn't Turi simply *give* Abreu more shares to reduce the debt? And why, then, did Abreu later give Turi back the 112,000 shares he was holding as collateral, but keep the 40,000 he had purchased? See, Tr. 665:14-667:10. The only explanation that makes sense is that the 40,000 shares that Abreu purchased were, in fact, Lona's shares. This is consistent with Lona's stated plan to take out a credit line on her home, buy stock, sell it, and then use the credit line to repay Abreu.

Memo. Decision After Trial.          10

not a partner and was not going to do anything to help retire the debt, Abreu would not have continued to sell phone cards to Time Zone. Tr. 270:16-271:5. Abreu further testified that he continued to do so *because of* Lona's representations regarding her use of a line of credit to repay him. Tr. 94:7-14; 104:21-23.

In late-September or early October 2001, on behalf of Time Zone, Turi signed a document called "Discount Contract for Phone Card Distributors." Ex. B. Abreu testified that he sent such a contract to every one of his distributors and that he only needed one signature from each distributor. Tr. 110:5-17.

In late-October 2001, at Abreu's urging and after discussion with Turi and Lona, Time Zone resumed paying Abreu by check. Tr. 32:7-15; 142:6-9; 268:18-269:2; 510:11-12. Abreu testified that accepting checks was a matter of convenience for him as it saved a significant amount of time. Tr. 32:17-21. Time Zone continued to issue checks that were dishonored by the bank. Tr. 86:10-15; 534:23-535:13; 580:22-23; 581:13-16.

On November 19, 2001, Abreu and Turi signed a document called "Contract Between Intertel and Time Zone Distributing," which identified payment terms for retiring the Time Zone debt. Ex. A. Abreu testified that he wanted both Lona and Turi to sign this document, but relented when they refused to sign anything with Lona's name on it because Lona maintained that she was not a partner. Tr. 106:6-107:4.

Abreu testified that in November 2001, concerned that Lona and Turi were continuing to deny that they were partners, Abreu

Memo. Decision After Trial.                11

went to the Santa Clara County Clerk's office and obtained a copy of Time Zone's FBS. Tr. 45:4-46:1. Abreu said he then confronted Turi and Lona with the FBS. Tr. 46:4-7. Lona allegedly responded that she had not signed the document and did not know anything about it. Tr. 46:8-10. Abreu testified that he reminded them that Lona had stated that she and Turi had started various business ventures together, and asserted that he knew that Lona and Turi were partners. Tr. 46:11-15.

In late November, Time Zone essentially stopped purchasing cards from Abreu. Tr. 80:17-19; 196:21-25. In December 2001, Time Zone made no purchases from Abreu on a credit basis and made only two additional cash purchases from Abreu in January 2002. Tr. 533:12-23.

**G. December 2001: "We failed . . ."**

On December 4, 2001, Turi and Lona sat in a car in front of Abreu's house waiting for him and finally left three letters on his doorstep when he did not return. Tr. 546:14-19; 547:13-19; 619:8-15. The first letter was unsigned and stated in part, "We tried desperately to get in touch with you tonight. . . . Please call me to discuss our options – we want to help – we don't want anyone to lose. Please forgive us for what happened ..[.]" Ex. 2. The second letter was also unsigned and stated in part, "I'm sorry we missed you! We've been waiting in front of your house[.] . . . Jose – seriously, if your offer still stands – Corrina & I would love your help in trying to save each others [sic] companies[.]" Ex. 3. The third letter was signed "Your friends Corrina & Tim" and stated in part, "[W]e welcome your

Memo. Decision After Trial.          12

help, expertise, friendship & support. . . . Corrina and I care about you greatly - and are willing to go all the way to correct what has been done. Please help us help you." Ex. 4.

Turi testified that while Lona was in the car with him for the entire time, and saw Turi writing the letters, Lona did not read them, did not participate in drafting them and Turi did not consult her in their drafting. Tr. 545:24-547:11; 619:16-620:9; 623:3-15.

Turi admitted at trial that the "we" in the letters referred to himself and Lona - but not the other Time Zone employees. Tr. 620:10-621:18. When asked why he would state that he and an independent contractor wanted to help, Turi testified that Lona was an "integral part of the business" and Turi needed her help "in order to pull this off." Tr. 622:1-6.

On December 7, 2001, Abreu met with Turi and Lona to discuss a plan for repayment of the Time Zone debt. Tr. 43:1-10; 531:23-532:14. Lona testified that Turi asked her to come to the meeting. Tr. 706:6-11. Turi testified that Abreu did not ask for Lona to be present, but that she "tagged along" because Lona was going to help Abreu redecorate his office even though she did not bring any interior decorating materials to the meeting. Tr. 552:1-8.

Abreu testified that at his request, Eugene Katz accompanied him to this meeting where Katz met Lona for the first time. Tr. 39:5-10; 155:1-4; 155:24-156:3.[6] Katz took notes during the

---

[6] Katz met Abreu in 1996 through Abreu's sister, whom Katz dated from 1998 through February of 2007. Tr. 154:2-8; 168:14-169:1. Katz testified that in 2007 Abreu's sister rejected Katz's

Memo. Decision After Trial.          13

meeting which he stated was out of habit rather than a request from Abreu.  Tr. 156:9-11; 157:24-158:2.

Katz, Abreu and Turi all testified regarding this meeting. Katz testified that Lona repeatedly stated that she felt horrible about the situation that she had put Abreu in, that she wanted to "make things right" and that she was not a "bad person."  Tr. 162:12-16.  Katz also testified that during the meeting, Lona never claimed that she was not Turi's partner, never asserted that she was just an employee of Time Zone, never said she was just trying to help Turi out.  Tr. 163:5-12.

Turi testified that Abreu asked to be paid $150,000 in "upfront money," which Turi stated he was unable to provide.  Tr. 569:18-570:3.  Turi testified that he offered alternatives, which Abreu turned down.  Tr. 570:3-6.  According to Turi, Abreu then asked Lona to contribute money which she declined to do because she claimed Time Zone was not her business or her debt.  Tr. 570:6-11.  Contrary to Turi's version of this event, Abreu and Katz testified that Lona promised to give Abreu her Lexus, stock certificates, jewelry and $100,000 of a $200,000 line of credit. Tr. 36:5-9; 38:9-15; 39:5-6; 40:25-41:7; 162:17-163:2.

Lona and Turi both denied that Lona offered to use any of her personal property to help pay the Time Zone debt.  Tr. 570:12-19; 571:11-12; 699:5-11; 705:21-706:16; 707:1-3. Contrary to Turi's testimony that Lona knew nothing about the

_____

marriage proposal. Tr. 169:2-3.  Katz also worked for Abreu from March 2003 through April 2005, but was not working for Abreu at the time of the December 7 meeting, or at the time of the trial. Tr. 153:22-24; 154:9-25; 179:2-3.

Memo. Decision After Trial.          14

December 4 letters, Abreu testified that Lona discussed the letters with him at the December 7 meeting. Tr. 49:9-14; 50:11-14; 51:10-15.

Katz testified that his impression from the meeting was that Turi and Lona were business partners who were taking responsibility for the Time Zone debt because Turi offered repayment plans and Lona offered personal property to be used to to reduce the balance owed - all so that Time Zone could resume purchasing phone cards from Abreu. Tr. 163:13-18; 167:4-15; 170:1-3.

Katz testified that he never heard Turi or Lona specifically say that Lona was Turi's partner or was an owner of Time Zone but she implied that she was a partner when she stated that she was willing to give Abreu her personal property to start repaying Time Zone's debt. Tr. 170:4-14; 171:7-18; 173:13-174:8.

**H.    Early 2002: Time Zone Becomes U&I - Lona named CEO**

In an apparent effort to be free of Time Zone's debts, in early 2002, Turi asked Alejandro Bernal, one of Time Zone's former drivers, to incorporate a phone card business entitled, U&I Telecom, Inc. ("U&I"). Tr. 626:20-627:15; 678:11-18. Turi testified that he asked Bernal to file the articles of incorporation because Turi first "wanted to square everything up with [Abreu] and other vendors" and "try to make a fresh start." Tr. 683:22-685:2.

A Statement of Information filed with the Secretary of State on April 10, 2002 named Lona as the chief executive officer and the sole director of U&I. Ex. 14. Turi testified that he paid

Memo. Decision After Trial.            15

the filing fee to incorporate U&I, ran the day to day operations and collected all the money. Tr. 678:11-679:1; 683:19-21. Despite the fact that he ran U&I (apparently as a continuation of Time Zone), Turi testified that he had no idea how or why Lona was named on the Statement of Information as the chief executive officer and sole director. Tr. 629:7-11; 679:6-12. Lona admitted she worked for U&I from January to November 2002. Tr. 714:6-11.

**I.  November 2002: Attempted Sale of U&I - Turi and Lona Identified as Business Partners**

On November 9, 2002, Turi "purchased" U&I from Bernal for a nominal sum. Tr. 627:17-628:2; Ex. CC. On or about November 15, 2002, Turi entered into a contract to sell the assets of U&I to an individual named Charlie Choi (the "Purchase Agreement"). Ex. 5. The Purchase Agreement states, in pertinent part, "*Tim J. Turi and Corrina Lona, his business partner*, *agree* to work for 30 days after Purchase Agreement date for the Buyer without compensation to help the Buyer retain existing customers and make smooth [sic] transition." Ex. 5 at ¶ 4(2). The Purchase Agreement also provided that "Both *Tim Turi and Corrina Lona agree that they will not directly compete* with the Buyer for 5 years from the Purchase Agreement date[.]" Ex. 5 at ¶ 5. The Purchase Agreement was signed by Turi as the president/owner of U&I and was signed by Lona as a witness. Ex. 5. Turi admitted that he had negotiated some of the Purchase Agreement terms, that he had made some changes to the Purchase Agreement before signing it, and that he had read the Purchase Agreement. Tr. 624:3-22. Turi also admitted that he knew that the Purchase Agreement

Memo. Decision After Trial.                    16

prevented Turi *and* Lona from competing with Choi for five years.
Tr. 661:2-8. Turi claimed, however, that he did not notice the
paragraph that identified Turi and Lona as business partners.
Tr. 624:23-625:16; 661:2-8. Turi also claimed that Lona never
read the Purchase Agreement and did not participate in the
negotiations. Tr. 624:5-13; 670:5-13.

As part of this transaction, Choi wrote several checks that
Lona held pending closing but ultimately returned to Choi because
the sale was never consummated. Tr. 656:12-657:2.

On March 13, 2003, Turi filed a Statement of Information
with the Secretary of State, which removed Lona as an officer and
director of U&I. Ex. DD.

**J.    Summer 2003: Turi and Lona File Chapter 7 Cases**

On June 16, 2003, Lona filed this chapter 7 case and on July
16, 2003, Turi filed his chapter 7 case. Turi's case was
determined to be a "no asset" case. Abreu and others filed
adversary proceedings against Turi, seeking to have the debts
owed by Turi determined to be nondischargable. The parties
subsequently settled the adversary proceedings and Turi received
his discharge on March 19, 2007.


**III. <u>DISCUSSION</u>**

**A.    Introduction**

Based on the testimony and evidence produced at trial (or
the absence thereof), the following facts appear to be undisputed
and the Court takes them to be true: (1) Neither Lona nor Turi
ever specifically told Abreu that Lona was a partner or owner of

Memo. Decision After Trial.          17

Time Zone; (2) Lona never signed any contracts between Abreu and Time Zone; (3) Abreu never asked for, nor received a credit application from Lona or from Turi; (4) no invoices were ever addressed to Lona personally; (5) all of the forms filed with the City of San Jose were signed by Turi doing business as Time Zone as a sole proprietorship; (6) Time Zone's bank account was in the name of Tim Turi, dba Time Zone Distributing and Lona did not have signing authority on it; (7) Turi did all of the hiring for Time Zone and made all decisions regarding whether to extend credit; (8) Turi negotiated prices, dealt with bounced checks and negotiated credit with Abreu; and (9) Time Zone's credit applications and personal guaranties were filled out by Turi as an individual.

### B. Applicable Law

State law determines the validity of a creditor's claim. Grogan v. Garner, 498 U.S. 279, 283 (1991) (citation omitted). Here, the validity of Abreu's claim depends entirely on Abreu proving the existence of an actual partnership or partnership by estoppel (ostensible partnership) under California law.

### C. Burden of Proof

In California, the burden of proving a partnership is on the party alleging it. Mercado v. Hoefler, 190 Cal. App. 2d 12, 16 (Cal. Dist. Ct. App. 1961) (citing Milstein v. Sartain, 133 P.2d 836, 841 (Cal. Dist. Ct. App. 1943)). Here, the parties have agreed that Abreu has the burden of proof with respect to whether Lona was an actual or ostensible partner of Turi/Time Zone. See, Abreu Trial Brief at 3:6-7.

Memo. Decision After Trial.                    18

The existence of a partnership is a question of fact that is determined by a preponderance of the evidence. Weiner v. Fleischman, 816 P.2d 892, 900 (Cal. 1991); Calada Materials Co. v. Collins, 7 Cal. Rptr. 374, 376 (Cal. Ct. App. 1960) (citation omitted). The preponderance of the evidence standard requires the trier of fact "to believe that the existence of a fact is more probable than its nonexistence." In re Michael G., 63 Cal. App. 4th 700, 709 n.6 (Cal. Ct. App. 1998).

### D. Witness Credibility

The key evidence in this case is from conflicting witness testimony regarding how - or whether - certain events unfolded between 1998 and 2002. Accordingly, the credibility of the witnesses is a significant factor in the Court's decision.

Where the testimony of a witness is not believed, the trier of fact may simply disregard it. Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 512 (1984). The Court's determinations regarding credibility are given due regard on appeal. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74 (1985).

While each of the witnesses may appear to have biases, the Court found some witnesses to be more credible than others and thus affords their testimony greater weight.

### 1. Jose Abreu

Abreu was a credible witness. It would have been convenient for Abreu to claim that both Lona and Turi stated, in no uncertain terms, on numerous occasions, that Lona and Turi were partners in Time Zone. This would have strengthened his case

Case: 03-53915   Doc# 255   Filed: 07/09/08   Entered: 07/09/08 13:18:55   Page 19 of 35

considerably. However, he freely admitted that neither of them ever specifically claimed that Lona was a partner. Instead, Abreu claims that he was led to believe that Lona was a partner by Turi and Lona's conduct. He also claims that his belief was later confirmed by documentary evidence (i.e., the FBS, the U&I documents). His candor strengthens his credibility.

### 2. Tim Turi

Tim Turi was not a credible witness. Turi had a romantic relationship with Lona. Whether that relationship existed at the time of the trial is unknown but the relationship provided him with a motive to shape his testimony to protect her. The more significant fact, however, is that Turi's testimony regarding the issues at the heart of this case was so absurd as to be incredible.

First, Turi testified that Lona did not know that she was named as a partner on the FBS. The Court cannot believe that after traveling extensively with Lona and planning to start their own business, Turi "forgot" to inform Lona that he included her as a partner on the FBS or did not seek her approval before doing so.

Second, Turi testified that Lona did not know what the December 4, 2001 letters said. However, in the letters, Turi referred to himself and Lona as "we" on numerous occasions, stated "Corrina and I care about you greatly – and are willing to go all the way to correct what has been done," and also stated, "Corrina & I would love your help in trying to save each others [sic] companies." The Court simply does not believe that in the

Memo. Decision After Trial.                    20

four hours that Lona and Turi sat in a car outside Abreu's house, Lona did not assist Turi in writing the letters and was not asked by Turi for input. Turi's version of events is also contradicted by Abreu's testimony regarding the December 7, 2001 meeting at which Lona appeared aware of the contents of the letters.

Third, Turi testified he did not know how or why Lona was listed as the chief executive officer and sole director of U&I on its original Statement by Domestic Stock Corporation. The Court finds this testimony incredible - and the name U&I itself directly and absurdly contradictory of Turi's version of events. Turi admitted the only reason that he had Bernal incorporate U&I was so Turi could negotiate with Time Zone's creditors and, if that failed, "try to make a fresh start[.]" Turi testified at trial that he controlled U&I from the start. Thus, the Court simply does not believe that Turi had no hand in filling out the paperwork that identified Lona as the chief executive officer and sole director. While U&I may have been formed to avoid Time Zone's obligations, for all practical purposes, U&I was a continuation of Time Zone's business, with the same structure, essentially the same employees, and with Lona and Turi as its principals.

Fourth, the Court finds it incredible that while Turi admitted to being aware of a 5-year non-compete clause for both he and Lona in the Purchase Agreement for the U&I assets, he did not *see* the provision that identified Turi and Lona as business partners. The Court also does not believe Turi's testimony that Lona was unaware of the terms of the Purchase Agreement - she

Case: 03-53915   Doc# 255   Filed: 07/09/08   Entered: 07/09/08 13:18:55   Page 21 of 35

signed it as a witness and she was to be bound by the 5-year non-compete provision.

Finally, Turi's testimony is contradictory on the critical issue of whether anyone ever asserted that Lona was a partner. For example, when asked on direct examination whether anyone told Turi that Lona was an owner or partner of Time Zone, Turi stated in no uncertain terms, "I've never heard it from anybody." Tr. 572:7-10.[7] Thereafter, Turi contradicted himself on at least three occasions, testifying that: (1) Abreu first asserted that Lona was a partner in February 2002; (2) Abreu first asserted that Lona was a partner in March 2002; and (3) although Abreu did not assert that Lona was a partner in February 2002, Katz did make such an assertion. Tr. 531:17-22; 572:13-573:14; 637:16-18. The inconsistencies in Turi's testimony render it unbelievable.

### 3. Eugene Katz

Eugene Katz was a credible witness. Mr. Katz testified regarding the December 7, 2001 meeting with Turi and Lona which he attended at Abreu's request. During his examination, Mr. Katz revealed that he had once had a romantic relationship with Abreu's sister and that Katz had worked for Abreu for a two year period after the December 7 meeting. As of the date of the trial, however, Mr. Katz's relationship with Abreu's sister had ended and he was no longer working for Abreu. Katz appeared to have no previous relationship with either Lona or Turi and no

_____

[7] Lona's counsel attempted to minimize Turi's statement by adding, "Well, as of that date." Tr. 572:11. Turi's testimony, however, was unequivocal and the Court will not give Turi the benefit of counsel's explanation.

Case: 03-53915    Doc# 255    Filed: 07/09/08    Entered: 07/09/08 13:18:55    Page 22 of
35

ulterior motive was uncovered upon cross examination.

### 4. Corrina Lona

Lona chose to testify only in rebuttal. Her testimony thus had limited utility. Beyond that, Lona's testimony was simply incredible on all points she addressed.

Lona testified that she never offered to pay any debts of Time Zone. This is in direct contradiction to the testimony of Abreu and Katz.

Lona's testimony regarding her 2001 income taxes was entirely contradictory, inconsistent and confusing. During cross-examination, Lona testified that her amended tax return for 2001 showed that she and her husband had earned $400,000 in 2001. When questioned as to what that amount was comprised of, Lona initially confirmed that she earned $78,000 working full time at Time Zone and testified that her husband earned $45,000 as a mechanic and that they had earned an additional $277,000 through her husband's "side jobs," through Lona's occasional interior decorating jobs, and through landscaping jobs that they both did. Thereafter, Lona changed her story and testified that she earned more than $78,000 from Time Zone in 2001. When asked how much more, Lona first stated that it was more than $100,000 and more than $200,000, but then backtracked and testified that she only received $78,000. Lona then tried to explain away the discrepancy by testifying that the amounts in her amended tax returns were averages of income over many years and the amounts were determined by the Franchise Tax Board and Lona's CPA. Then, inexplicably, Lona could not remember anything about how much she

Memo. Decision After Trial.              23

had reported in income in 1999, 2000 or 2001 and again claimed that the amounts listed in her tax returns were determined by her CPA and the Franchise Tax Board.

Because Lona's testimony regarding her offers to pay Time Zone debts was contradicted by other credible testimony and her testimony as to her income was limited, inconsistent and confusing, the Court affords her testimony little weight.

### 5. Alvaro Amador

Alvaro Amador was not a credible witness. Suffice it to say, he appeared to be seeking recovery of the debt owed to his company by Time Zone and would say or do anything to accomplish that goal no matter how far he strayed from reality to achieve it.

### 6. Distributors Nguyen, Bobesku and Diaz

Lona also offered the testimony of three phone card distributors, Swan Nguyen, Romulus Bobesku, and Mauricio Diaz (the "Distributors") to support her case that she was not thought to be a partner in the Time Zone business. While the Court found the Distributors to be credible, their testimony was of limited relevance to the issues in this trial and did not ultimately weigh in the decision.

### 7. Marysol Solorio

Lona also called Marysol Solorio, an employee of Time Zone. Like the Distributors, her testimony was credible, but her lack of knowledge regarding the critical issues limited its relevance.

/ / / /

/ / / /

Memo. Decision After Trial.                    24

## E. Partnership, in General

In California, partnerships formed after 1996 are governed by California's Uniform Partnership Act of 1994 (the "UPA") (Cal. Corp. Code § 16100, et seq.). Under the UPA, liability for the debts of a partnership may be premised on an actual partnership pursuant to California Corporations Code § 16202, or partnership by estoppel pursuant to California Corporations Code § 16308(a). Once partnership is established, California Corporations Code § 16308(a) provides that unless otherwise agreed by the claimant or provided by law, all partners are jointly and severally liable for all partnership obligations. California Corporations Code § 16308(a) (West 2008). Whether a partnership exists is a question of fact to be determined by the trial court. Spier v. Lang, 4 Cal. 2d 711, 716 (Cal. 1935); Associated Piping & Eng'g v. Jones, 17 Cal. App. 2d 107, 112 (Cal. Dist. Ct. App. 1936).

## F. Actual Partnership

Pursuant to the UPA, "[T]he association of two or more persons to carry on as coowners a business for profit forms a partnership, whether or not the persons intend to form a partnership." Cal. Corp. Code § 16202(a) (West 2008).

Ordinarily, the existence of an actual partnership is evidenced by the right of the respective parties to participate in the profits and losses of the business, the contribution by the partners of either money, property or services and some degree of participation by the partners in the management and control of the business. Billups v. Tiernan, 11 Cal. App. 3d 372, 379 (Cal. Ct. App. 1970) (some degree of participation in

Memo. Decision After Trial.              25

management and control of business); <u>Mercado v. Hoefler</u>, 190 Cal.
App. 2d 12, 16-17 (Cal. Dist. Ct. App. 1961) (contribution of
money, property or services); <u>Constans v. Ross</u>, 106 Cal. App. 2d
at 386 (sharing in profits and losses of business).  The fact,
however, that profits and losses are not shared equally does not
necessarily compel a conclusion that no partnership existed.
<u>Constans v. Ross</u>, 106 Cal. App. 2d at 389.  Nor does the unequal
apportionment of management duties compel a conclusion of no
partnership.  <u>Constans v. Ross</u>, 106 Cal. App. 2d at 388-89
(citations omitted); <u>Associated Piping & Eng'g v. Jones</u>, 17 Cal.
App. 2d at 111.  It is immaterial if the parties do not designate
their relationship as a partnership or if they do not know that
they are partners, for intent may be implied from their acts.
<u>Associated Piping & Eng'g v. Jones</u>, 17 Cal. App. 2d at 110
(citations omitted); <u>Thompson v. O.W. Childs Estate Co.</u>, 90 Cal.
App. 552, 554 (Cal. Dist. Ct. App. 1928) (citation omitted).

Where the rights of a third party are involved, the
fundamental question is whether, based on the conduct of the
alleged partners, the third party had a right to believe that a
partnership existed.  <u>Hansen v. Burford</u>, 212 Cal. 100, 110 (Cal.
1931); <u>Associated Piping & Eng'g v. Jones</u>, 17 Cal. App. 2d 107,
111 (Cal. Dist. Ct. App. 1936).  As a result, each case is
adjudicated on its own facts and "very little value will be found
from any extended review of the authorities."  <u>Westcott v.
Gilman</u>, 170 Cal. 562, 569 (Cal. 1915); <u>Associated Piping & Eng'g
v. Jones</u>, 17 Cal. App. 2d 107, 111 (Cal. Dist. Ct. App. 1936).
/ / / /

Memo. Decision After Trial.          26

Based on Lona and Turi's conduct and the surrounding circumstances as a whole, the Court finds Abreu has sustained his burden of proving that an actual partnership existed.

First, Lona and Turi's words and actions, when taken together, evidenced an actual partnership. When Abreu first met Lona in March or May 2001, Lona informed Abreu that she had invested $100,000 into Time Zone and was working hard to make the business successful. In June or July of 2001, when Time Zone's debt continued to grow, Lona told Abreu that she was going to help pay off the debt. On various occasions after that, Lona again promised to take out a credit line secured by her home and use the credit line, her stock, her car and her jewelry as payment of the debt owed to Abreu.

In August of 2001, when Abreu purchased 40,000 shares of Soluminaire stock from Lona, she endorsed the $40,000 check and deposited it into Time Zone's account. The Court finds it highly unlikely, if not outright incredible, that an employee or independent contractor would invest this kind of money, would offer to pay off her "employer's" debts or would offer to use her own valuable personal property to do so. This is not the conduct of an employee. It is the conduct of a partner in a business - a person who shares in profits and losses of the business and has a vested interest in its continuation.

The documentary evidence both before and after the time period in question also supports a finding of an actual partnership. See, Olive v. Turner, 120 F. Supp. 478, 482-83 (W.D. Okla. 1954) (evidence of conduct both before and after the

Memo. Decision After Trial.        27

date of the transactions at issue is admissible in determining the fact of partnership); <u>Cyrus v. Cyrus</u>, 64 N.W. 2d 538, 541-42 (Minn. 1954) (in determining whether a partnership exists, evidence of conduct preceding alleged partnership is material evidence of the parties' intent). First, Turi filed a FBS, listing Lona as a partner. Despite Turi's unreliable testimony to the contrary, the Court does not believe that this was a decision made without consultation with Lona. In fact, before Turi filed the FBS, Lona and Turi discussed opening a business together and traveled extensively to research that business. The fact that the business they engaged in was phone cards rather than watches is immaterial.

Second, on December 4, 2001, Turi and Lona wrote three letters to Abreu. Each letter referred to Lona and Turi as "we" multiple times – a fact Turi admitted at trial. Turi testified that he included Lona in the letter because she was "integral" to the success of the business. However, he later contradicted this testimony when he stated that the assistance of his other employees was also crucial. The fact that Turi had other employees at the time, but that he admittedly referred only to himself and Lona in the letters supports a finding that Lona's position with Time Zone was markedly different than that of a mere employee. The statements in the letters make it clear that Turi and Lona believed they were jointly responsible for the debt to Abreu and wanted to work together to pay off that debt.

For example, the first letter stated, "Please forgive *us* for what happened – not because of our effort or our intentions –

Memo. Decision After Trial. 28

that *we failed* - just circumstances out of our control." The
second letter stated "Corrina & I would love your help in trying
to save *each others* [sic] companies." The third letter stated
"[*W*]e welcome your help, expertise, friendship & support. . . .
*Corrina & I* care about you greatly - and are willing to go all
the way to correct what has been done. Please - *help us help
you*. Your friends, Corrina & Tim." Turi's consistent use of the
first person plural when asking Abreu for assistance indicates
that Lona and Turi were partners who wanted to find a way to
continue their business. The fact that they were together at the
time they wrote the letters also supports a conclusion that the
letters constitute a joint statement of their ownership of the
business.

The documentation for the formation of U&I in which Lona was
named chief executive officer also supports a finding that her
role in Time Zone was not that of an employee. U&I was
admittedly set up to continue the Time Zone business free of its
creditors and her continuing role with U&I is consistent with her
role in Time Zone. When sale of U&I was contemplated, Turi
negotiated sale documents identifying Lona as a partner and
committing her to a 5 year non-competition agreement. Turi's
claim that she was unaware of these terms is simply incredible.

The fact that Lona appears to have only played a managerial
role in signing up new distributors and that Turi made most, if
not all, of the other management decisions does not preclude a
finding of actual partnership, especially where other evidence
points to the existence of a partnership. <u>Constans v. Ross</u>, 106

Memo. Decision After Trial.          29

Cal. App. 2d at 388-89 (citations omitted); <u>Associated Piping &</u>
<u>Eng'g v. Jones</u>, 17 Cal. App. 2d at 111.

The cumulative weight of the evidence - Lona's travels with
Turi to research business opportunities, her repeated promises to
use her personal property to reduce the debt, her deposit of
$40,000 into the Time Zone account, the handwritten letters, the
FBS in which she was named as a partner, the U&I documentation in
which she was named as the chief executive officer, the
documentation for the attempted sale of U&I in which she was
named as a partner and agreed to a 5-year non-competition clause
- all support a conclusion that her role was that of a principal
in the Time Zone business with all the benefits and burdens
associated with it.  The fact that her 2001 federal income tax
return indicated income of $400,000 despite her story that Time
Zone paid her only $78,000 for that year also supports a finding
that her involvement was far different than she or Turi have
tried to portray it.

Turi and Lona's denial that there was a partnership is of
little consequence.  First, neither of them was a credible
witness.  Second, the existence of a partnership is not
determined by the parties' designation of their arrangement.
<u>Greene v. Brooks</u>, 235 Cal App. 2d 161, 166 (Cal. Dist. Ct. App.
1965).  Instead, it depends primarily upon the intention of the
parties ascertained from the terms of any agreement, from the
parties' acts and from the surrounding circumstances as a whole.
<u>Id.</u>; <u>Constans v. Ross</u>, 106 Cal. App. 2d 381, 386-389 (Cal. Dist.
Ct. App. 1951).  Here, Turi and Lona's claims that there was no

Memo. Decision After Trial.          30

partnership are belied by their words, their actions and by a substantial amount of documentary proof. On this record, the Court finds that an actual partnership existed.

### G. Partnership by Estoppel

The UPA provides that where there is insufficient evidence of an actual partnership, partnership liability may arise by estoppel. The UPA provides for liability for one who, by words or by conduct, purports to be, or consents to being represented by another, as a partner in a partnership. The purported partner is liable to the person to whom the representation is made if that person, relying on the representation, enters into a transaction with the alleged partnership. Cal. Corp. Code § 16308(a) (West 2008). The conduct of the ostensible partner must be sufficient to induce a reasonable and prudent person to believe that a partnership exists and for that person to enter into a transaction in reliance on that belief. Armato v. Baden, 71 Cal. App. 4th 885, 898 (Cal. Ct. App. 1999) (citing Crabbe v. Mires, 112 Cal. App. 2d 456, 459 (Cal. Dist. Ct. App. 1952)).

To prove partnership by estoppel, Abreu must show that: (1) the acts and conduct of Turi and Lona were factually and legally sufficient to lead Abreu to reasonably believe Lona was a copartner; and (2) Abreu relied on Lona's representations in entering into transactions with Time Zone. J&J Builders Supply v. Caffin, 248 Cal. App. 2d 292, 297 (Cal. Ct. App. 1967); J.C. Wattenbarger & Sons v. Sanders, 216 Cal. App. 2d 495, 500-01 (Cal. Dist. Ct. App. 1963); Hunter v. Croysdill, 169 Cal. App. 2d 307, 315.

Memo. Decision After Trial.          31

1    As an initial matter, the evidence that supported the
2  Court's finding of an actual partnership satisfies Abreu's burden
3  of proof on the issue of whether Turi and Lona's conduct was
4  factually and legally sufficient to lead Abreu to reasonably
5  believe that Lona was a partner with Turi in Time Zone.  For
6  liability on a partnership by estoppel theory, Abreu must prove
7  the additional element of reliance.

8    Abreu testified that he agreed to continue doing business
9  with Time Zone and to accept Time Zone checks in reliance on: (i)
10 Lona and Turi's conduct, which made it appear that they were
11 partners; and (ii) Lona's statements that she would ensure
12 payment of Time Zone's debt.  Abreu also claimed that as a result
13 of this reliance, he is owed in excess of $439,000.  The Court is
14 not persuaded.

15   When Abreu began doing business with Time Zone in January
16 2001, he believed that Turi was Time Zone's owner.  Abreu did not
17 meet Lona until March or May 2001.  Thus, Abreu could not have
18 relied on Lona's status as a partner when he first began doing
19 business with Time Zone and extended it credit.

20   Abreu also testified that it was not until mid-year 2001
21 that he began to believe that Turi and Lona were partners and it
22 was not until late June or early July of 2001 that Lona first
23 told Abreu that she was going to help pay off the debt.  By this
24 point, Time Zone owed Abreu between $210,000 (as of June 29,
25 2001) and $303,000 (as of July 5, 2001).  Because this portion of
26 the debt was incurred prior to Lona making any representations
27 about helping to pay it off it could not have been incurred in
28

Memo. Decision After Trial.          32

reliance on those promises.

Further, the record does not support that the only, or even the primary reason that Abreu continued to extend credit to Time Zone was Lona's promises. Review of the accounting provided by Turi indicates that Time Zone consistently incurred debt and then partially reduced it, despite the fact that Lona never apparently fulfilled any of her specific promises. The fact of the matter is that Abreu was receiving payments and while he likely hoped that Lona would follow through with her promises to reduce the debt, he did not actually rely upon them and could not have reasonably relied on them once Lona began to assert that she was not a partner. As a result, the Court cannot find that it is more likely than not that Abreu continued to extend credit to Time Zone because of those promises.

Finally, Abreu alleges that in reliance on Lona's promises to pay Time Zone's debts, he resumed accepting checks in the fourth week of October 2001. To the contrary, Abreu testified that he "had been telling them for a couple of months we should go back to checks, but it was in October that they finally started giving me checks." Abreu testified that he started accepting checks again because "I was having to go there every day to pick up a payment. It would just have been easier if they would deposit into the account and we would just deposit the check. This was literally a three to four day a week thing to go down there and have to collect this." Thus, Abreu's own testimony indicates that his decision to accept checks was more a function of convenience than a function of Lona's promises.

Memo. Decision After Trial.     33

On this record, Abreu has not met his burden of proving that he relied on Lona's representations or her promises in deciding to continue doing business with Time Zone or in deciding to accept Time Zone checks in October 2001. Accordingly, the Court does not find that an ostensible partnership or partnership by estoppel existed.

**IV. <u>CONCLUSION</u>**

Based on the evidence and testimony at trial, Abreu has proved, by a preponderance of the evidence, that Turi and Lona conducted Time Zone as an actual partnership. As a result, Lona is liable on Time Zone's debt to Abreu. Lona's Objection to Abreu's Claim is overruled and Abreu's claim in the stipulated amount of $439,000 is allowed. A separate Order will issue.

Memo. Decision After Trial.          34

**Court service list:** **[by mail and/or ecf]**


David V. Duperrault  [ecf]
25 Metro Drive, Suite 600
San Jose, CA 95110
dvd@svlg.com

Stevan C. Adelman [mail]
25 Metro Drive, 7th Floor
San Jose, CA 95110

Kathryn Diemer [ecf]
75 E. Santa Clara St., Suite 290
San Jose, CA 95113
kdiemer@diemerwhitman.com

Charles Maher [ecf]
121 Spear St., Suite 200
San Francisco, CA 94105
cmaher@luce.com

Memo. Decision After Trial.            35